Terry CLOUSE, Helen Clouse, Michael Clouse, Jaqueline Clouse, Charles Eugene Akers and Edna Akers, Appellants,

v.

NOBLE COUNTY DRAINAGE BOARD and Scott Zeigler, Appellees.

No. 57A03–0310–CV–430.

Court of Appeals of Indiana.

June 4, 2004.

David Van Gilder, Van Gilder & Trzynka, Fort Wayne, IN, Attorney for Appellants.

James B. Mowery, Yoder & Mowery, Kendallville, IN, Attorney for Appellees.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

In September 2002, the Noble County Drainage Board ("the Board") issued its final order regarding maintenance of the Hosler Watershed System ("the Watershed"), in which the Board assessed periodic maintenance rates to be paid by persons who own land within the Watershed. Thereafter, Terry Clouse, Helen Clouse, Michael Clouse, Jaqueline Clouse, Charles Eugene Akers, and Edna Akers (collectively, "the Petitioners"), owners of land within the Watershed, filed a Petition for Judicial Review of the Board's final order under Indiana Code Section 36-9-27-106. Following an evidentiary hearing, the trial court issued findings and conclusions affirming the Board's order. The Petitioners now appeal and present several arguments, which we consolidate into a single issue: whether the evidence supports the trial court's determination that the Board complied with Indiana law when it assessed the periodic maintenance rates.

We affirm.

### FACTS AND PROCEDURAL HISTORY

The drains located within the Watershed were constructed around the year 1900. The Watershed is comprised of approximately 2,854 acres and 164 separate parcels. For all relevant periods, the drains in the Watershed have been regulated drains[1] and have been characterized as

---

1. A "regulated drain" means "an open drain, a tiled drain, or a combination of the two." Ind.Code § 36-9-27-2. An "open drain" means "a natural or artificial open channel

drains in need of periodic maintenance. *See* Ind.Code § 36–9–27–34(a)(2) (stating county surveyor shall classify all regulated drains in county as either drains in need of reconstruction, drains in need of periodic maintenance, or drains that should be vacated).[2] Specifically, in 1985, the county surveyor at that time classified the drains as drains in need of periodic maintenance, but the Board ordered no assessment fees.

In 2001, flooding occurred in the Watershed along County Road 300 East. Noble County Surveyor Scott Zeigler investigated the flooding and determined that a portion of the Veazey tile had collapsed and was blocking water traveling downstream. The surveyor's office replaced approximately twenty feet of tile. Thereafter, Zeigler began to inspect the status of the remaining portions of the Veazey tile, in addition to other drains in the Watershed. He then prepared a Periodic Maintenance Report of the Hosler Watershed System, as required by Indiana Code Section 36–9–27–38, in which he proposed that the Board assess a per acre and minimum parcel fee to pay for several proposed maintenance projects in the Watershed. That report clarified that although the Watershed had been classified as a drain in need of periodic maintenance for several years, no maintenance had been performed. Zeigler agreed with the classification and suggested that the system "be placed on maintenance at a level sufficient

to perform necessary maintenance on the regulated drains within the system." The report also provided in relevant part:

> I have attached hereto a list of all lands that I feel are benefited by the Hosler Watershed System[;] the list is labeled as "The Hosler Watershed System Schedule of Assessments." [3] This list includes the parcel number and the name of the owner of each tract of land as shown in the record of transfers kept by the Noble County Auditor. Also included within said list are the proposed annual assessments of each tract of land being benefited by the periodic maintenance [of] said drain. The percent of the total annual assessment of the system is also shown for each landowner.

> The annual assessment for each tract of land is based on the reimbursement of work that was performed at the end of 2001 and the beginning of 2002 on the Veazey Tile. This work included the removal of some obstructions to the tile and some minor repairs in order to correct a severe road flooding problem on County Road 300 East. The final bills have not been received for this project as of this date. However, the estimate for this work is approximately $2,500.00.

> The proposed work for this system would include first de-brushing and bottom dipping of the Veazey Open ditch and replacement of the Veazey Tile to

---

2. A regulated drain is in need of periodic maintenance when, with or without the use of mechanical equipment, it can be made to that: (1) carries surplus water; and (2) was established under or made subject to any drainage statute." *Id.* A "tiled drain" means "a tiled channel that: (1) carries surplus water; and (2) was established under or made subject to any drainage statute." *Id.* Our review of the record reveals that the Watershed consists of a combination of at least one open drain and at least one tiled drain.

perform the function for which it was designed and constructed, and to properly drain all affected land under current conditions, by periodically:

 (1) cleaning it;
 (2) spraying it;
 (3) removing obstructions from it; and
 (4) making minor repairs to it.
Ind.Code § 36–9–27–34(c).

3. The schedule of assessments was not included in either party's appendix.

resolve the road flooding problem on County Road 300 East. Then the Hosler Ditch would be de-brushed and bottom dipped beginning at the bottom end and working upstream to the top end of the system. The maintenance funds that are collected would also be utilized to replace and repair any other regulated tile within the system. At the proposed rates and at today's costs, it will take approximately fifteen years to de-brush and bottom dip the open ditches and to replace the regulated tile within the system.

The annual cost of periodic maintenance for the Hosler Watershed System is estimated to be $37,221.65. This rate, if established by the Noble County Drainage Board, would continue until such time that the system balance is equal to four times the annual assessment. At that point the system would stop collecting until the system balance drops below four times the annual assessment when it would begin collecting again. The Noble County Drainage Board could also determine that once a given amount of work has been performed or at a certain time that the rates for the system would be reduced to a lower amount.

In the process of establishing the proposed periodic maintenance rates, I have considered all benefits (including those identified in I.C. 36–9–27–112) accruing to each parcel of land within the Hosler Watershed System. Different parcels of land may derive different benefits from the maintenance of the regulated drains within this system. It is my opinion that each acre of land benefits by the below mentioned rate per acre and that

all tracts of land benefit by the minimum rates as shown below.

Zeigler recommended in his report that each landowner pay $12 per acre, with a minimum rate of $75 per parcel.

On February 11, 2002, the Board conducted a hearing concerning maintenance of the Watershed.[4] During the hearing, Zeigler reported on the status of the Watershed. The minutes of the hearing provide in relevant part:

Zeigler explained some of the problems in [the Watershed]. Recently, Zeigler walked the main open [drain] in this watershed except for the portion south of 550 [South] and rode the 4–wheeler to inspect the [Veazey] Tile. The bottom end of the open [drain] has [a] large amount of brush and has about 2–feet of sediment in it. There are several log jams and bank slides along the very winding open [drain]. Landowner, Eugene Akers[,] has done some work privately on the tile and open drains on his property. There were a few blowholes on his ground.

\* \* \*

Zeigler stated that the proposed assessment sent out is $12.00 an acre, with a $75.00 minimum. This would bring in $37,221.65 a year. This assessment will replace or repair every county drain in the system over a course of 15 years. This assessment rate could be cut depending on what amount of work the Board and[/]or landowners would like to have done and how soon. There are some tiles that could be opened up and made into an open drain and this would save some money. There was an emergency repair under county road 300E on

4. Prior to that date, the Petitioners, along with other landowners, filed Objections to Proposed Assessment with the Board.

the [Veazey] tile due to flooding over the road. This needed to be done before someone was hurt. After inspecting the [Veazey] tile[,] there were 16 blowholes and a reverse grade. This will cost $4,000.00 to $6,000.00 to repair just the blowholes on this one tile. It would be better just to replace the whole [Veazey] tile instead of trying to repair the blowholes. It would be more cost efficient.

Zeigler also stated during the hearing that, in his opinion, the proposed assessment rates were not excessive.

After Zeigler concluded his remarks, several landowners, including one of the Petitioners, spoke out against the proposed assessment. Some of the landowners then agreed to form a committee to work with Zeigler to select a periodic maintenance rate "that is acceptable for everyone." The Board voted to "re-convene" the issue of periodic maintenance fees for the Watershed on April 8, 2002.

On March 20, 2002, Zeigler prepared his Amended Periodic Maintenance Report, which was similar to his original report with a few exceptions. First, the amended report clarified that the work performed in 2001 on the Veazey tile cost $564. Second, the amended report contained five specific maintenance projects that Zeigler recommended "be completed in order but as soon as possible[.]" Zeigler explained the proposed projects in detail, and the projects had estimated costs of $47,500, $8,800, $45,000, $4,800, and $4,800, respectively. The amended report also provided:

> In addition [to] the above mentioned projects, I have estimated that the system would need $4,500 each year to perform minor repairs and maintenance of the open and tile drains. This amount would include $1,000 for spray-

ing and $3,500 for minor tile and open ditch repairs. It is my recommendation that at the amended rates[,] a maximum of $3,500 per year for no more than two years (or a total of $7,000) would be spen[t] on any tile system. Those tile systems are the Hosler, Freeling–Gaff, and the N. Brown. If the tile system needs to be reconstructed then the landowners will need to petition to reconstruct the tile, pay a separate maintenance assessment for the tile or replace the tile themselves. The tile would need to be reconstructed or replaced, if in the opinion of the Noble County Surveyor the tile system could not be made to properly function for a total cost to the tile system of less than $7,000 or $3,500 each year over a [two-year] period.

Certain landowners have expressed concern about the county de-brushing portions of the open ditches that do not need any maintenance work performed at this time. I would recommend that only those sections of open drains that need to have immediate maintenance performed on them be de-brushed. However, all sections of open ditch that are de-brushed should be sprayed to prevent the re-growth of woody vegetation. If debris is determined to be in the channel then the Noble County Surveyor shall notify the landowner on whose property the debris is located and give them a reasonable time (at least ten days but no more than ninety days and subject to weather conditions) to remove the debris or the county will remove it at the system[']s expense. The debris could include any logjam, fallen trees or other obstruction or potential obstruction to the channel. This will not prohibit the Noble County Drainage Board from at some time in the future de-brushing and performing maintenance on any drain within the system. Howev-

er, de-brushing would only be performed immediately prior to a maintenance project.

Zeigler's amended report contained the same language as the original report regarding benefits to each tract of land. However, Zeigler proposed new, decreased periodic assessment rates as follows: $4 per acre, with a minimum rate of $25 per parcel for ten years and, thereafter, $2 per acre with a minimum rate of $25 per parcel.

The Board reconvened its hearing on the Watershed on September 9, 2002.[5] After Zeigler discussed his amended report and members of the public commented, the Board adopted Zeigler's amended report and ordered that the periodic maintenance projects outlined in that report be performed. The Board then issued both Findings of Fact for Periodic Maintenance and a Final Order for the Periodic Maintenance of the Hosler Tile Watershed System, which provide in relevant part:

### FINDINGS OF FACT FOR PERIODIC MAINTENANCE

\* \* \*

3. The Surveyor's fact sheet shall be accepted as part of the evidence and the facts thereon are true.
4. The drain/system is classified as, "In need of Periodic Maintenance."
5. There will be no damages paid to any landowners for this project.
6. None of the [following] benefit factors of Section 112 of the [Indiana Code] are excluded:
 A. The watershed affected by the drain to be maintained;
 B. The number of acres in each tract;
 C. The total volume of water draining into or through the drain to be maintained, and the amount of water contributed by each landowner;
 D. The land use;
 E. The increased value accruing to each tract of land from the maintenance;
 F. Whether the various tracts are adjacent, upland, upstream, or downstream in relation to the main trunk of the drain;
 G. Elimination or reduction of damage from floods;
 H. The soil type; and
 I. Any other factors affecting the reconstruction.

\* \* \*

10. That the Survey's report to the Board with maps and drawings is received as evidence, approved by the Board, and facts therein are found to be true.
11. That all of the lands included in the watershed are assessed.
12. That no lands outside the watershed are assessed.
13. That none of the benefits assessed against any landowner are excessive.
14. That no further evidence is required for the Board to make a decision.

\* \* \*

20. That the drain as a whole is in need of periodic maintenance and the current rates are insufficient to make the necessary repairs.

\* \* \*

24. That all relevant documentation in the files of the Surveyor and the

5. The record suggests that the Board did reconvene on April 8, 2002, but we do not have the minutes for that hearing, nor do the parties discuss that hearing.

Board regarding this drain is received into evidence by the Board.

25. That the schedule of assessments as revised and filed are adopted by the Board.

26. That the Secretary of the Board shall publish the notice of the Board's Final Order as required by the [Indiana Code].

27. That the Final Order form of the Board is approved for this drain.

## FINAL ORDER FOR THE PERIODIC MAINTENANCE OF THE HOSLER WATERSHED

\* \* \*

1. Jurisdiction. That the existing drains are regulated drains, and are within the jurisdiction of this Board, pursuant to I.C. 36–9–27–15.

2. Report of Surveyor. That the Board referred the Hosler Watershed System herein to the surveyor to prepare a report, which report was filed and presented to this Board on February 11, 2002[,] in the Dekko Conference Room of the South County Office Complex, Albion, Indiana.

3. Schedule of Assessments. That the Board then prepared a schedule of assessments and damages pursuant to I.C. 36–9–27–42, naming each landowner benefited or damaged, his address, percent of total cost to be assessed against each tract of land based upon benefit received, and showing the amount of each owner's annual assessment based on the total estimated cost of the proposed periodic maintenance.[6]

\* \* \*

7. Evidence Concerning Objections. Pursuant to I.C. 36–9–27–42[,] at the final hearing the [Board] heard and considered all written objections and evidence filed and has entered an order, as justice has required.

\* \* \*

10. Amendment to Surveyor's Report. The original ... Surveyor's report[ ] w[as] presented to the Board on February 11, 2002. The Surveyor's report was further amended in accordance with the results of the hearing [and an] Amended Report was presented on April 8, 2002.

11. Periodic Maintenance. Said watershed system is in need of periodic maintenance and the total estimated annual cost of periodic maintenance of said drain is $12,594.10.

\* \* \*

17. FINDING OF FACTS. After hearing all the evidence presented at the hearing, for and against, the Board made the following findings: [reference to Findings of Fact set forth above.]

NOW THEREFORE, IT IS ORDERED by the [Board] that:

A. The Findings of Fact are adopted by the Board as true and accurate for this proceeding; AND

B. The report of the Surveyor, the schedule of assessments, and any amendments shall be adopted and the periodic maintenance rates shall be increase[ed] as follows: $4.00/Acre with a $25.00 Minimum Rate per Tract of Land for TEN years (2003–2012). THEN $2.00/Acre with a $25.00 Minimum Rate per Tract of Land thereafter (2013—following).

On September 27, 2002, the Petitioners filed a petition for judicial review of the

6. Again, the schedule of assessments was not made part of the record on appeal.

Board's final order, alleging in relevant part: (1) the Board's order was arbitrary, capricious, unlawful or not supported by substantial evidence; (2) the Board's order "was not based upon the benefits that would allegedly accrue to each tract of land as a result of the Board's determination[;]" (3) the Petitioners' land will not be benefited by the periodic maintenance; (4) the Petitioners' land will be damaged by the periodic maintenance; (5) the Board "failed to substantiate that the regulated drain[s] within the Hosler Watershed system are not performing the function[;]" and (6) the Board failed to consider the factors listed at Indiana Code Section 36–9–27–112 in determining benefits to the individual tracts.

The trial court conducted a hearing on the petition for judicial review on July 18, 2003. During that hearing, the Petitioners testified to the details of each of their respective tracts of land to support their claim that the periodic maintenance ordered by the Board would not benefit their land. In addition, Anthony Fleming, a geologist who specializes in hydrogeology and also a landowner in the Watershed, testified at length regarding the alleged need and/or benefit of the periodic maintenance projects ordered. Fleming's testimony, as a whole, conflicted with the evidence and opinions Zeigler had expressed at the hearings. Zeigler also testified at length regarding, among other things, the process by which he reached the assessment rates recommended in his original and amended reports.

At the conclusion of the evidence, the parties agreed to submit proposed findings and conclusions to the court. On September 16, 2003, the trial court issued its Findings and Order of the Court, which provided in relevant part:

4. That the Court heard "de novo" the issues regarding plaintiffs' claim that land owned by them was not benefited by the proposed drainage work and that the plaintiffs will suffer damages as a result of the defendant's proposed work (as required by I.C. § 36–9–27–107);

5. That all other issues raised by plaintiffs have been considered and determined exclusively upon the record made before the board and filed with the court (Id.);

\* \* \*

7. That the plaintiffs failed to prove that property they own would be damaged as a result of the proposed periodic maintenance;

8. That the defendant has proven that the acreage owned by the plaintiffs will benefit both directly and indirectly, from the proposed maintenance.

9. That the alleged "uniform assessment" used by the defendant was not arbitrary and was based upon substantial evidence as presented by the Noble County Surveyor;

10. That the Noble County Surveyor did conduct an assessment of the benefits and damages that would accrue to each tract of land and presented this information to the Board which based its decision on this assessment[.]

11. That the defendants considered all relevant factors and made all required findings necessary to issue its final order in compliance with Indiana law.

\* \* \*

**Therefore, the Court hereby affirms the Noble County Drainage Board's "Final Order For Periodic Maintenance Of The Hosler Tile Watershed System."**

(Bold in original). The Petitioners now appeal.

## DISCUSSION AND DECISION

### Standard of Review

Indiana Code Section 36–9–27–107 governs judicial review of a drainage board decision, and subsection (c) of that statute provides that "[i]n affirming or setting aside a decision or determination of the board, the court shall enter its findings and order or judgment on the record." In addition, Indiana Trial Rule 52(A)(3) states in relevant part that the trial court shall make special findings of fact without request "in any ... case provided by these rules or *by statute.*" (Emphasis added). Accordingly, the trial court in this case was required to enter special findings of fact. *See id.*

 We apply a two-tiered standard of review to special findings entered under Trial Rule 52(A). *See Stonger v. Sorrell,* 776 N.E.2d 353, 358 (Ind.2002). First, we determine whether the evidence supports the findings and second, whether the findings support the judgment. *Id.* We will set aside the trial court's findings and conclusions only if they are clearly erroneous. *See id.* In reviewing the trial court's entry of special findings, we neither reweigh the evidence nor reassess the credibility of the witnesses. *Id.* Rather, we must accept the ultimate facts as stated by the trial court if there is evidence to sustain them. *Id.* Findings are clearly erroneous where a review of the record leaves us firmly convinced that a mistake has been made. *Carmichael v. Siegel,* 754 N.E.2d 619, 625 (Ind.Ct.App.2001).

### Indiana Drainage Law

Before we address the Petitioners' arguments, we note the procedural posture in which this matter came before the trial court. Indiana Code Section 36–9–27–107 provides in relevant part:

(a) Whenever a petition for judicial review is filed on the ground that:

(1) the board found that the petitioner's land would be benefited by the ... maintenance of a drain, and the benefits assessed were excessive; or

(2) the petitioner's lands would be damaged by the ... maintenance of a drain; and:

(A) the board failed to so find; or

(B) the amount of damages awarded was inadequate;

the court shall proceed to hear the issue of benefits or damages de novo. A change of venue may be taken from the judge and from the county, and a jury trial may be obtained, in accordance with the rules governing the trial of civil actions. An appeal may be taken in accordance with the rules governing appellate procedure.

(b) Whenever a petition for judicial review is filed on any ground other than those set forth in subsection (a), the review shall be heard by the court without the intervention of a jury. The court may not try or determine the cause de novo, but shall consider and determine the cause exclusively upon the record made before the board and filed with the court....

\* \* \*

(d) When a petition for judicial review presents issues that shall be heard de novo and issues that may not be heard de novo, the court shall separate the issues and shall proceed to determine the issues that may not be heard de novo. When the court's judgment on the issues that may not be heard de novo becomes final, or when the appeal is decided if an appeal is taken, the board shall proceed in accordance with

the final judgment or appellate decision despite the fact that the issues to be heard de novo may be undecided and pending before the court or on appeal.

Here, at the beginning of the hearing on July 18, 2003, the trial court acknowledged its statutory duty to separate those issues it was to review de novo from other claims the Petitioners had raised in their petition for judicial review.[7] In particular, the trial court was required under the statute to review de novo the Petitioners' claims regarding benefits and/or damages to their land as a result of the periodic maintenance. In addressing all other claims, the trial court, and this court, is limited to the record that was before the Board when it issued its final order. *See* I.C. § 36-9-27-107(d).

In addition to the statute that explains the trial court's de novo review of certain issues, the Petitioners' arguments primarily involve two statutes. Indiana Code Section 36-9-27-39 provides:

When the board receives a maintenance report [8] under section 38 of this chapter, it shall prepare a schedule of assessments that includes the following items:

(1) *A description of each tract of land determined to be benefited,* and the name and address of the owner, as listed on the county surveyor's report.

(2) The percentage of the estimated cost of periodically maintaining the drain to be assessed against each tract of land. *The percentage shall be based upon the benefit accruing to each tract of land from the maintenance,*

and must be at least one hundred percent (100%) and as near to one hundred percent (100%) as is practicable.

(3) The amount annually assessed against each tract of land for maintenance.

*The board may consider the factors listed in section 112 of this chapter in preparing the schedule.*

I.C. § 36-9-27-39 (emphases added). And Indiana Code Section 36-9-27-112 provides in relevant part:

(a) *In determining benefits to land under sections 39 ... of this chapter, the board may consider:*

(1) the watershed affected by the drain to be ... maintained;

(2) the number of acres in each tract;

(3) the total volume of water draining into or through the drain to be ... maintained, and the amount of water contributed by each land owner;

(4) the land use;

(5) the increased value accruing to each tract of land from the ... maintenance;

(6) whether the various tracts are adjacent, upland, upstream, or downstream in relation to the main trunk of the drain;

(7) elimination or reduction of damage from floods;

(8) the soil type; and

(9) any other factors affecting the ... maintenance.

---

7. Contrary to the statute, the trial court did not "proceed to determine the issues that may not be heard de novo." *See* I.C. § 36-9-27-107(d). Rather, the trial court addressed all issues in a single judgment. Neither party claims that this amounts to error, and we find no harm given that the court separated the benefits and damages issues from the other claims the Petitioners raised in their petition.

8. *See* I.C. § 36-9-27-38 (providing that surveyor shall prepare report for regulated drains classified in need of periodic maintenance).

(b) *In determining benefits or damages to land under sections 39 ... of this chapter, the board may examine aerial photographs and topographical or other maps,* and may adjourn the hearing to the site of the ... maintenance in order to personally view the affected land.

(Emphases added).

### The Petitioners' Arguments

The Petitioners set out the trial court's findings numbered 7 through 11 as "pertinent" to their appeal. However, they do not challenge the sufficiency of the evidence to support each of those findings. Rather, the Petitioners' arguments are most easily characterized as an attack on the trial court's finding that the Board "considered all relevant factors and made all required findings necessary to issue its final order in compliance with Indiana law[.]"[9] To the extent that the Petitioners do address particular findings, we discuss those below.

### A. Record Before the Board

■ We first address those issues, the review of which the trial court was limited to the record before the Board. First, the Petitioners claim that there is no evidence to show that the regulated drains were not performing their functions and, thus, the Board had no grounds to support its decision to approve and adopt the surveyor's classification of the drains as drains in need of periodic maintenance. In support

of their argument, the Petitioners direct us to Indiana Code Section 36–9–27–34(b)(1). But that subsection of the statute relates to drains in need of reconstruction, not drains in need of periodic maintenance. As we have already noted, subsection (c) of Indiana Code Section 36–9–27–34, not subsection (b), sets forth the criteria relevant to the surveyor's decision to classify a regulated drain as a drain in need of periodic maintenance. *See* n. 2, *supra.* None of the criteria under subsection (c) define a drain in need of periodic maintenance as a drain that will not perform the function for which it was designed and constructed. *See* I.C. § 36–9–27–34(b)(1) (addressing drain in need of reconstruction). Thus, the Petitioners' reliance on subsection (b) is misplaced.

Nevertheless, Zeigler's original and amended reports, along with his statements at the Board hearings, are sufficient to support the determination that the regulated drains in the Watershed are drains in need of periodic maintenance. In particular, Zeigler's reports and statements at the hearing address the flooding of County Road 300 East, which was caused by problems with the Veazey tile. His reports also detail the need for de-brushing along different areas of the Open ditch. And Zeigler explained at the February 2002 hearing that he discovered various problems with the drains after he walked the Open ditch and, using a four-wheeler, inspected the Veazey tile. Further, the record before the Board establishes that the regulated drains in the Watershed had had

---

**9.** The Petitioners complain that the trial court's findings do not inform the litigants of the "specific evidentiary foundation" for its decision. Our courts have, on occasion, remanded cases where the trial court issued special findings that were merely "a recitation of the evidence presented at the hearing." *See In re T.J.F.,* 798 N.E.2d 867, 874 (Ind.Ct.App.2003). But the Petitioners do not request that we remand the case for entry of

more specific findings, and the court's findings in this case are more than a mere recitation of facts. Indeed, the trial court's findings have allowed the Petitioners to formulate intelligent and specific arguments on appeal. *See id.* (explaining trial court's duty to enter findings that allow parties to formulate arguments on appeal). We conclude that the trial court's findings are sufficient.

little or no maintenance since 1985 and perhaps long before that. In sum, the Petitioners' claim that the Board had no grounds to support its determination that the regulated drains are in need of periodic maintenance is incorrect. *See* I.C. § 36–9–27–34(c) (explaining regulated drain is in need of periodic maintenance when it can be made to perform function for which it was designed or constructed and to properly drain all affected land under current conditions by periodically cleaning, spraying, removing obstructions from, or making minor repairs to drain).

The Petitioners also assert that the evidence does not support the trial court's finding that the Board considered the factors listed under Indiana Code Section 36–9–27–112(a) when it determined that their tracts of land would benefit from the periodic maintenance.[10] Again, under Indiana Code Section 36–9–27–39, after the Board receives a maintenance report from the surveyor, it shall prepare a schedule of assessments that includes certain items. One of those items is "[a] description of each tract of land determined to be benefited...." I.C. § 36–9–27–39(1). That statutes also provides that the "board *may* consider the factors listed in section 112 ... *in preparing the schedule.*" I.C. § 36–9–27–39 (emphasis added). And under Indiana Code Section 36–9–27–112(a), in determining benefits to land for purposes of the schedule of assessments, the Board *may* consider the factors listed therein, in addition to any other factors affecting maintenance.

■ First, we agree with the Board that it is not *required* to consider the factors

under section 112(a) when determining benefits to land. Indeed, both Indiana Code Section 36–9–27–39 and Indiana Code Section 36–9–27–112 use the word "may." "The term 'may' in a statute ordinarily implies a permissive condition and a grant of discretion." *Romine v. Gagle,* 782 N.E.2d 369, 380 (Ind.Ct.App.2003) (citing *Schoemer v. Hanes & Assoc., Inc.,* 693 N.E.2d 1333 (Ind.Ct.App.1998)), *trans. denied.* As this court explained in *Whitley, Noble and Allen Joint Drainage Board v. Tschantz,* 461 N.E.2d 1146, 1149 (Ind.Ct. App.1984), section 112(a) "was adopted by the legislature *to provide guidance* for determining the benefits which accrue to various tracts of land within a watershed." (Emphasis added). Thus, while the Board could, in its discretion, look to section 112(a) in determining benefits, consideration of those factors is not required under the law, and if the Board had failed to consider those factors, their assessment would not necessarily be arbitrary or invalid.

■ In any event, our review of the record that was before the Board supports the trial court's finding that the Board considered "all relevant factors." Zeigler's original and amended reports state that, in the process of establishing the proposed periodic maintenance rates, he considered "all benefits (including those identified in I.C. 36–9–27–112) accruing to each parcel of land within the Hosler watershed System." Both reports also summarize that "[d]ifferent parcels of land may derive different benefits from the maintenance of the regulated drains within the system[,]" and that in his opinion, "each acre of land benefits by [$4 per acre] and that all tracts

---

**10.** The trial court did not make a specific finding that the Board considered the factors under section 112. However, the trial court did find that "the Noble County Surveyor did conduct an assessment of the benefits and damages that would accrue to each tract of land and presented this information to the Board which based its decision on this assessment." The court also found in relevant part that the Board "considered all relevant factors ... in compliance with Indiana law."

of land benefit by the minimum rate [of $25]." In addition, during the February 2002 hearing, one of the Board members asked Zeigler whether he had assessed all benefits and whether the benefits were excessive. Zeigler responded that, in his opinion, "the benefits are not excessive." Based on Zeigler's reports and statements at the hearing, the Board found that "[n]one of the benefit factors of Section 112 . . . are excluded[.]"

Further, while the Petitioners focus on the factors listed under section 112(a), the record also shows that Zeigler presented the Board with aerial photographs, drainage maps, and drawings of the Watershed. In addition to the factors listed under section 112(a), that statute also permits the Board to review aerial photographs and topographical and other maps in determining benefits or damages to land. *See* I.C. § 36–9–27–112(b). Therefore, we conclude that there was evidence before the Board to support the trial court's finding that the Board considered all statutory factors in determining benefits.

■ Still, the Petitioners point out that the Board's findings of fact "do not explain what benefits were considered as to each acre or tract of land." Similarly, they complain that the copy of the final order that the Board sent to the Akers did not identify the specific benefits to the Akers' land. To the extent that the Petitioners allege that the Board was required to: (1) identify all benefits considered and/or determined regarding each of the 164 tracts in its findings of fact, or (2) set out the specific benefits to each acre or tract when it gave notice to every landowner in the Watershed, we conclude that the Petitioners are reading requirements into the applicable statutes that do not exist. Indeed, nothing in Indiana Code Section 36–9–27–

39 (schedule of assessments) or Indiana Code Section 36–9–27–112 (benefits board may consider in determining benefits or damages) requires the Board to explain or identify the specific benefits to each acre or tract of affected land. Rather, Indiana Code Section 36–9–27–39 sets forth the only requirements with which the Board must comply when it prepares a schedule of assessments. Although subsection (2) of that statute, which requires the Board to include the percentage of the estimated cost of periodically maintaining the drain to be assessed against each tract of land, does state that the "percentage shall be based upon the benefit accruing to each tract of land from the maintenance," there is no requirement that the Board *identify* the specific benefits to each tract. Again, the evidence before the Board supports the trial court's findings on this issue.

### B. De Novo Review

■ The only issue the trial court heard de novo was whether the Petitioners' land would be benefited and/or damaged by the periodic maintenance and whether the benefits assessed were excessive. The Petitioners allege that the evidence presented both to the Board and to the trial court at the July 18 hearing fails to support the trial court's finding that "the [Board] has proven that the acreage owned by the [Petitioners] will benefit both directly and indirectly, from the proposed periodic maintenance."

In both his original and amended reports, Zeigler expressed his belief that all land included on "The Hosler Watershed System Schedule of Assessments" will benefit from periodic maintenance. And as we discussed above, *see A. Record Before the Board, supra,* Zeigler's amended report provides that "[d]ifferent parcels of land may derive different benefits from the

maintenance of the regulated drains within the system[,]" and that in his opinion, "each acre of land benefits by [$4 per acre] and that all tracts of land benefit by the minimum rate [of $25]." In addition, Zeigler stated during the February 2002 hearing that, in his opinion, "the benefits [assessed] are not excessive."

■ At the hearing on July 18, 2003, Zeigler discussed the particular benefits to the Akers' land as follows:

> Well number one, that if there was no maintenance performed on that at all then certainly you would not be able to ... produce a crop on the land that he has there. And I think as indicated by Mr. Akers['] ... testimony before that he has maintained that drain over the years by himself. So that, that benefit is derived because of the maintenance....

Similarly, Terry Clouse testified that in 1997, his family installed tile on their property to get rid of standing water. That the Akers and the Clouses have performed their own maintenance over the years supports a reasonable inference that periodic maintenance performed by the county will benefit their land in the future. "In determining whether lands are benefited, ... it is not necessary that the benefits be direct and immediate to justify an assessment. Future possibilities, if any, as well as collateral or indirect benefits, may be considered." *Hubenthal v. Crain,* 239 Ind. 646, 159 N.E.2d 850, 853 (1959) (quotations and citation omitted).

Zeigler also explained that after he personally viewed the various tracts of land within the Watershed and studied various drainage maps, and based upon his knowledge of the county and years of experience, he evaluated the benefits to each tract. He explained that all of the land in the Watershed is agricultural. And although different tracts would benefit for different reasons, he determined that, on balance, each tract would benefit equally from periodic maintenance. In particular, regarding the volume of water from each tract, he stated:

> In this case here, there are no Wal-Marts, there ... really are no towns. There are, it[']s just some agricultural land and some houses. So in essence, the volume of water is very similar from one to another. Yeah you can say, okay the woods contributes a little bit more than the corn, uh, or the, it contributes a little less [than] the corn, excuse me, that the woods would discharge slightly less water than what a cornfield would, or slightly more water than pasture ground would. But to calculate that, no I didn't do that. I just know that ... within the bounds of that Watershed that parcels are in general discharging fairly equal amounts of water into the system.

When asked whether his determination of benefits to the land was based on mere assumptions, he stated:

> I didn't assume. I viewed that myself and ... I viewed the uses of those land[s] myself, personally and I made an expert opinion based on my years of training and expertise in the county that ... those discharges of water for those land uses were equal.

And in explaining what he meant when he testified that the benefits and damages to the various tracts of land "zeroed out," he stated in relevant part:

> Well only what we're looking at is an assessment. At some point in this process we have to arrive at a dollar amount that we're going to equate to each tract of land. Whether that be a different dollar for every single acre, or whatever it is, ... in essence we've de-

termined the benefits are equal so it's an equal, you know assessment ... for all those parcels. So at some point we have to end up ... at a dollar amount for those parcels. of land. So we have to have some process in order to ... look at those different factors to determine is there one particular geographic area that has substantially less benefit than another area, or are those in essence fairly equal. So ... before we get to the dollar amount we're trying to determine in essence is each acre in general within that Watershed similarly benefited ... when you look at all those factors, or does there seem to be some sort of a dividing line for instance that ... indicates, that they have a substantially higher benefit that they need to be assessed differently.... So that's I guess maybe in essence what I was meaning, that they ... zeroed out. That in essence there wasn't one parcel of land, one tract of land ... that appeared to have substantially higher benefit or lesser benefit than any of the other ones.

Still, the Petitioners direct us to Fleming's testimony, which contradicts Zeigler's statements that all tracts will benefit equally. For example, Fleming testified that wooded tracts produce less water flow and that uplands would receive no benefit from periodic maintenance. And Akers, whose family has owned 152 acres in the Watershed since 1937, testified that he has not had problems with flooding on his property. Clouse, whose family has owned 159 acres in the Watershed since 1941, also denied any problems with his land flooding. But we will not reweigh the evidence at the hearing, *see Stonger,* 776 N.E.2d at 358, and based on our review of the record, the Petitioners have not firmly convinced us that the trial court made a mistake when it found that the Petitioners will benefit both directly and indirectly from

the periodic maintenance. *See Carmichael,* 754 N.E.2d at 625; *see also Hubenthal,* 239 Ind. 646, 159 N.E.2d at 853 (explaining benefits to land need not be direct and immediate).

## C. Was the assessment arbitrary as a matter of law?

■ Finally, the Petitioners contend that the trial court erred when it affirmed the Board's final order because the "uniform per acre assessment" is arbitrary as a matter of law. In support, they direct us to *Hubenthal* and *Whitley.* But we agree with the Board that those cases are distinguishable.

In *Hubenthal,* 159 N.E.2d at 851–52, the appellants successfully attacked the method by which the county had assessed the land in a watershed for the purpose of repairing an open ditch. The county ordered certain per acre assessments, which the trial court reduced after a hearing. *Id.* The supreme court explained that:

In this case the assessment per acre was arrived at initially by the surveyor and viewers and finally by the court by first estimating the cost of an arbitrary segment of ditch which laid within a watershed area and then dividing the number of acres in the watershed area into said estimated cost. *The extent to which the particular land would or would not be benefited as compared with other land in the area was not considered in establishing the particular assessment.*

*Id.* at 852 (emphasis added). The court emphasized that "the clear mandate" of the statute in effect at that time was that "the costs of installation or repair of drains shall be apportioned according to the benefits derived therefrom." *Id.* at 853 (quotations and citation omitted). Because the assessment in that case did not take into account benefits to the tracts of land, the

court reversed the trial court's judgment and remanded for a new trial. *Id.*

More recently in *Whitley,* 461 N.E.2d at 1147, the drainage board approved a project to clear the Eel River and ordered a uniform assessment upon all tracts of land within the Eel River watershed. But as in *Hubenthal,* the drainage board in *Whitley* did not assess the benefits to each tract of land. Instead, the theory behind the uniform assessment was that every acre of land which drained into the river contributed to the drainage problems and, thus, all tracts must pay equally. *Id.* at 1147–48. When landowners challenged the assessment in their petition for judicial review, the trial court concluded that the assessment was arbitrary, and we affirmed the trial court's conclusion on appeal. Indeed, we followed *Hubenthal* and clarified that "the current drainage statutes retain the prior law's requirement that assessments be based upon benefits accruing from the maintenance." *Id.* at 1148.

The Petitioners suggest that *Hubenthal* and *Whitley* establish that uniform per acre assessments are per se invalid. We disagree. Those cases merely clarify the requirement that currently appears in Indiana Code Section 36–9–27–39(2), namely, that the percentage of the cost of periodic maintenance assessed to each tract of land shall be based upon the benefit accruing to each tract from the maintenance.[11] As we have discussed throughout this opinion, the Board in this case did not impose a per acre assessment rate without considering the benefits and damages to the affected tracts of land. Our review of Zeigler's surveyor's reports and his testimony at the July 18, 2003, hearing establishes that he recommended the per acre and minimum per parcel rates after he had viewed the tracts and land and considered the various benefit factors set out under Indiana Code Section 36–9–27–112(a), in addition to aerial photographs and drainage maps. Based on all of those considerations, Zeigler concluded that each tract of land would benefit equally from the periodic maintenance, and the Board adopted his recommendation.[12] Because the Board considered the benefits to the tracts of land, *Hubenthal* and *Whitley* are inapposite. In a watershed system, drainage within the watershed does not respect property lines, and a pro-ration of benefits and assessments based on acreage is not unreasonable, provided that the benefits have been considered. We conclude that the Board's per acre and minimum per parcel assessment rates are not arbitrary as a matter of law, and the trial court did

---

**11.** Again, however, that statute does not require the Board to identify the benefits assessed to each parcel in its assessment order.

**12.** In support of their assertion that the Board's assessment was arbitrary, the Petitioners also emphasize that Zeigler reduced the rate of his recommended per acre assessment from January to March based only on the fact that the scope of the maintenance work to be performed had been reduced. In particular, Zeigler reduced the rates he proposed in his January report, $12 per acre with a $75 minimum per tract, to $4 per acre with a $25 minimum per tract in his March report. The Petitioners claim that that evidence sup-

ports a conclusion that the Board did not consider the benefits to the tracts of land when it adopted the rates Zeigler recommended in his amended report. But Zeigler explained that "none of the benefits changed" between January and March and that "in the two assessments ... [t]he rates came down proportionally." He explained further:

Again, my opinion is that [the benefits and damages to the tracts of land] were just proportionally reduced. The ... original proposal was for total replacement of all open drains and tiles within the system and we're doing proportions less than that so the benefits associated, you know, were ... reduced proportionally.

not err when it affirmed the Board's final order.

Affirmed.

KIRSCH, C.J., and RILEY, J., concur.