

ATTORNEY FOR APPELLANTS

Jeffrey O. Meunier
Carmel, Indiana

ATTORNEY FOR APPELLEE

Steven A. Holt
Holt Legal
Noblesville, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

Kip Bergman, Scot Gasho, Jane Harper, Philip Overdorf, Brent Snow, and George Tebbe,

*Appellants-Petitioners,*

v.

Big Cicero Creek Joint Drainage Board,

*Appellee-Respondent.*

November 22, 2019

Court of Appeals Case No.
19A-MI-1486

Appeal from the Tipton Circuit
Court

The Honorable Mark Dudley,
Special Judge

Trial Court Cause No.
80C01-1710-MI-340

**Najam, Judge.**

## Statement of the Case

Kip Bergman, Scot Gasho, Jane Harper, Philip Overdorf, Brent Snow, and

George Tebbe (collectively "Landowners") filed a petition for judicial review of

a decision by the Big Cicero Creek Joint Drainage Board ("the Board")

regarding a reconstruction project. The trial court affirmed the Board's decision. Landowners appeal and raise three issues for our review:

1. Whether the trial court erred when it found that the Board was not prohibited from funding a reconstruction project through a loan to be repaid with excess funds in a maintenance fund.

2. Whether the trial court erred when it found that the Board was not required to issue bonds to pay for the reconstruction project.

3. Whether the trial court erred when it found that Landowners' claim that the Board was improperly formed was barred under the doctrine of laches.

[2] We affirm.

## Facts and Procedural History

[3] Landowners own parcels of real property in Tipton and Atlanta, Indiana. Their parcels are located within the Big Cicero Creek watershed ("the watershed"). The Board, which was formed in 1991, is a "multi-county joint drainage board consisting of five members." Appellants' App. Vol. 2 at 41. On October 17, 2014, the Board mailed a notice to all landowners in the watershed, including Landowners, stating in relevant part that a maintenance report and schedule of assessments had been filed and were available for public inspection and that a public hearing was scheduled for November 19. Following the public hearing, the Board issued written findings and an order "adopting and approving the

maintenance report and schedule of assessments as reported by the County surveyors in their report." *Id.* at 19.

[4] In that 2014 report, surveyors from four counties in the watershed recommended a significant increase in annual maintenance fund assessments and an increase in the maintenance fund balance. In particular, the surveyors stated that, "[w]ith this increase in the available balance in the drain fund the Board would then be able to utilize maintenance funds to fully pay or partially pay for future reconstruction projects." *Id.* at 140. The surveyors concluded that the plan "would *reduce or eliminate assessments for future reconstructions* on Big Cicero Creek." *Id.* (emphasis added). Landowners did not seek judicial review of the Board's November 2014 order.

[5] In 2017, the Board asked the Tipton County surveyor to prepare a report regarding a plan for "partial reconstruction" of the Big Cicero Creek Open Drain System ("the drain system"). *Id.* at 19. In that 2017 report, the Tipton County surveyor proposed a partial reconstruction of the drain system projected to cost $4.7 million. He recommended that "no additional assessments be sought, that the project should be funded by an outside source, with repayment occurring from a portion of the current revenue stream that is captured under the maintenance assessment for the drain[.]" *Id.* at 63.

[6] Thereafter, on September 15, the Board mailed notices to affected landowners that a hearing would be held regarding the proposed partial reconstruction of the drain system. The Board also made available to the public the Tipton

County surveyor's report and the schedule of assessments. Following the public hearing on the partial reconstruction plan on September 20, the Board, in a decision dated September 22, adopted and approved the surveyor's recommendations and found in relevant part as follows:

> 3. No additional assessments for Partial Reconstruction shall be levied against [the] public;
>
> 4. Funding for the project shall be obtained from either private or public sources for the partial reconstruction, with repayment coming from a portion of the yearly maintenance assessment until the debt is paid in full; not to exceed more than 75 percent of the annual assessment in any given year.

*Id.* at 167.

[7] On October 10, Landowners timely filed their petition for judicial review of the Board's September 22 decision. In particular, Landowners asserted that

> [t]he Big Cicero Creek Joint Drainage Board's decision was wholly arbitrary, capricious, unlawful, an abuse of discretion, not in accordance with the law and in excess of statuary [sic] jurisdiction, authority, limitations, or short of statuary [sic] right. In addition, the Big Cicero Creek Joint Drainage Board acted without observance of procedure required by law and its decision is unsupported by substantial evidence.

*Id.* at 43. Landowners also alleged that, because "the Board's first meeting [in 1991] took place 35 days after the meeting was required to take place" pursuant to statute, the Board was "improperly formed" and must be disbanded. *Id.* at 24-25.

Following a hearing on Landowners' petition for judicial review on February 5, 2019, the trial court denied the petition. In its findings and conclusions, the trial court stated in relevant part as follows:

INTRODUCTION

The court's presumption [sic] i[n] this case arose for two (2) primary reasons. The first is the [Landowners] disagree with the reconstruction plan adopted by [the Board] because they feel very strongly it will not address or alleviate the flooding on Big Cicero Creek and as a corollary to this feeling is that they should not be forced to pay for it. The second reason this case arose is that the [Landowners] feel that the Board was not fully transparent with its intentions. The Board's intention, in 2014, was to fund a future reconstruction of Big Cicero Creek via an increased maintenance assessment. The Board adopted a maintenance assessment in 2014 knowing that it was larger than what was needed for annual maintenance. The Board intended to create a surplus over a number of years and then transfer 75% of that surplus to use as a down payment on a partial reconstruction of Big Cicero Creek. [Landowners], among others, paid the maintenance assessment and the Board received those payments fully intending to use them for reconstruction purposes at a later date. No one asked for judicial review or otherwise appealed the Board's 2014 increased maintenance assessment and the issue of the propriety of that increase is not at issue today. *The issue is whether the Board may transfer excess from the maintenance fund to its reconstruction fund*. The established statutory scheme allows the collection of up to eight (8) times the estimated annual cost of periodic maintenance of a drain and then later transfer 75% of that excess to a reconstruction fund. . . .

* * *

FINDINGS OF FACT

* * *

3. On September 17, 2014, the surveyors of Tipton County, Hamilton County, Boone County and Clinton County submitted a report to the Board outlining their request that the Board increase the maintenance assessments as they had not been raised in twenty-one (21) years and that the solutions for solving issues have outstripped the current maintenance funds and were not adequate to keep up with the maintenance needs of the drain. *The surveyors also requested the Board increase the limitation on the maintenance fund to up to 8 times the annual maintenance assessment as allowed in Section 43 of the Indiana Drainage Code as this would allow the Board to utilize maintenance funds to fully pay or partially pay for future reconstruction projects* as Section 45.5 of the Drainage Code allowed a transfer of up to 75% of the maintenance fund to pay for reconstruction projects and eliminate assessments for future reconstruction projects on Big Cicero Creek.

4. On October 17, 2014, Notice was sent to landowners stating, in relevant part "You are hereby notified that the maintenance report of the Tipton, Hamilton, Boone & Clinton County Surveyors and the schedule of assessments made by the Big Cicero Creek Drainage Board have been filed and are available for public inspection in the offices of the Tipton, Hamilton, Boone & Clinton County Surveyors." The notice also provided a link to the Surveyors' Report to the Board. The Notice also stated that a public hearing was scheduled for November 19, 2014, on the maintenance report and schedule of assessments.

5. The Board held a public hearing on November 19, 2014, and issued "Written Findings and Order" adopting and approving the maintenance report and schedule of assessments as reported by the County surveyors in their report.

6. [There is no evidence] that any petition for judicial review was filed following the November 19, 2014 [decision] of the Board adopting and approving the maintenance report.

* * *

9.  On September 20, 2017, after timely notice to the public regarding reconstruction allocating current and future maintenance assessment[s], the Board held a public hearing regarding the surveyor's reconstruction report and schedule of assessments for a reconstruction project on the Big Cicero Creek drain.

* * *

13.  At the conclusion of the September 20, 2017, public hearing, the Board approved and adopted the surveyors' reconstruction findings and proposed a schedule of assessments.

14.  On October 10, 2017, [Landowners] timely filed a Petition for Judicial Review of the Board's September 20, 2017 decision. Specifically, in their Verified Petition for Judicial Review, [Landowners] contended:

a.  The Board should be disbanded;

* * *

i.  The assessment amounts were intentionally overstated to accumulate funds for an ulterior use;

j.  The use of a percentage of the maintenance funds to pay for a reconstruction project is being deliberately misapplied in this case;

k.  The proposed financing of the project is not in compliance with Indiana Law;

* * *

CONCLUSIONS OF LAW

\* \* \*

## Formation of the Big Cicero Creek Drainage Board

\* \* \*

15. Even if this court ignored the procedural deficiencies [alleged by Landowners with respect to the Board's formation in 1991], this court finds that Indiana law does not support [Landowners'] request to disband the Board 27 years after its creation over alleged defective notices. Even if true, [Landowners'] claims are barred by the doctrine of laches as [Landowners'] 27-year delay in challenging the formation of [the] Board is inexcusable and the Board has operated for 27 years, completing maintenance and reconstruction projects on the drain, collecting maintenance funds, and has entered into a variety of contracts and other obligations such that it would be prejudiced by a disbandment. . . .

16. Therefore, this court concludes that [Landowners'] contention that the Board was improperly formed due to improper notice is not supported by the record before the court on [Landowners'] Petition for Judicial Review and this basis for judicial review is hereby denied.

\* \* \*

## Use of Excess Maintenance Funds for Reconstruction

40. This court concludes that Section 43 of the Drainage Law does reveal the legislature's intent to allow the Board to create an excess in the maintenance fund. Section 43 grants a drainage board discretion in collecting a maintenance assessment even if the assessment would increase the maintenance fund balance to four (4) times the annual cost of periodic maintenance or up to . . . eight (8) times the annual cost of periodic maintenance (as long as a public hearing is held).

41. This court concludes that Section 43 of the Indiana Drainage Law demonstrates the legislature's intent to allow a Board to create an excess in the maintenance fund as allowing a drainage board to collect maintenance assessments up to eight (8) times the annual cost of maintenance is necessarily going to create an excess. [Landowners'] argument that only maintenance assessment excesses created in the routine collection of assessments were the legislature's intent cannot be squared with this provision of the Drainage Law allowing the Board to increase the maintenance assessment up to (8) times the amount of routine maintenance assessments. Clearly, the legislature was allowing the Board to create substantial maintenance excesses.

42. Since the Indiana legislature also drafted section 45.5 of the Drainage statute, these sections of the Indiana Drainage Law demonstrate the legislature's intent to allow up to 75% of the maintenance fund excess created (by allowing up [to] 8 times of maintenance assessments to be collected) to be transferred to the reconstruction fund. Therefore, this court concludes the Board's transfer of 75% of the maintenance assessments to the reconstruction fund was lawful under the Indiana Drainage Law and it does not render the Board's September 20, 2017, decision as arbitrary, capricious, unlawful, or not supported by substantial evidence.

* * *

**Financing of the Reconstruction Project**

53. Finally, [Landowners] argue that the Board's proposed financing of the project is not in compliance with Indiana law. Specifically, [Landowners] argue that if "the Board finds that the amount of a reconstruction project exceeds the amount that the owners can pay over a five (5) year period, then the only recourse is for the Board to resolve to sell bonds per I[.]C[. §] 36-9-27-94(a)." [Landowners] contend that because this mandatory statutory procedure to sell bonds was not followed, the financing

of the project is "totally contradictory to the provisions of the Indiana Drainage Code."

54. I[.]C[. §] 36-9-27-94(a) states:

> (a) Whenever the board determines by resolution spread upon its minutes that the cost of constructing or reconstructing a particular drain is in excess of that amount that the owners of land to be assessed may conveniently pay in installments over a five (5) year period, it shall authorize the sale of bonds to finance the construction or reconstruction.

55. While Section 94 of the Drainage Statute requires the Board to issue bonds to finance certain reconstruction projects, this section only requires the Board to authorize the sale of bonds when the Board determines that the cost of reconstruction is in excess of the amount that owners of land to be assessed may conveniently pay in installments over a five (5) year period. This court concludes the legislative intent of this section is facially clear. Its purpose is to prevent landowners assessed for a reconstruction project from having outrageously high assessments for an expensive reconstruction project being amortized over a short five-year period.

56. Here, the court concludes the landowners were properly assessed $0 for the proposed reconstruction due to the unambiguously permissible transfer of excess maintenance funds to the reconstruction to cover the cost of the reconstruction. Therefore, with a proper $0 assessment to the assessed landowners for the reconstruction, in this case, there was no need for the Board to determine that the assessment was more than the amount the assessed landowners can conveniently pay in installments over a five (5) year period. Consequently, pursuant to section 94 of the Drainage Statute, there was no need for the Board to authorize the sale of bonds to finance the reconstruction.

*Id.* at 15-34 (emphases added).  This appeal ensued.

# Discussion and Decision

### *Standard of Review*

[9]     On appeal, Landowners assert that the trial court erred when it affirmed the Board's decision.  In *Ross v. Bartholomew County Drainage Board*, this Court set out the applicable standard of review:

> We apply a two-tiered standard of review to special findings entered under Trial Rule 52(A).  *Clouse v. Noble C[ty]. Drainage Bd.*, 809 N.E.2d 849, 857 (Ind. Ct. App. 2004), *trans. denied*. First, we determine whether the evidence supports the findings and second, whether the findings support the judgment.  *Id.*  We will set aside the trial court's findings and conclusions only if they are clearly erroneous.  *Id.*  In reviewing the trial court's entry of special findings, we neither reweigh the evidence nor reassess the credibility of the witnesses.  *Id.*  Rather, we must accept the ultimate facts as stated by the trial court if there is evidence to sustain them.  *Id.*  Findings are clearly erroneous where a review of the record leaves us firmly convinced that a mistake has been made.  *Id.*  While we defer to the trial court's findings of fact, we do not defer to its conclusions of law.  *Schrader v. Porter C[ty]. Drainage Bd.*, 880 N.E.2d 304, 307 (Ind. Ct. App. 2008), *trans. denied*.

995 N.E.2d 1051, 1053-54 (Ind. Ct. App. 2013), *trans. denied*.

[10]    Further, this appeal requires us to interpret and apply Indiana's Drainage Law. As our Supreme Court has explained,

> [t]he Indiana Drainage Law . . . establishes an extensive and detailed regulatory scheme for addressing drainage issues.  It

creates a drainage board in each county, I.C. § 36-9-27-4, and gives the board jurisdiction over all regulated drains[] in the respective county, except as otherwise provided by the statute, I.C. § 36-9-27-15. The Drainage Law vests these boards with comprehensive regulatory authority to construct, reconstruct, and maintain public drains to alleviate problems associated with flooding, wetlands, and other accumulated surface water. I.C. §§ 36-9-27-38 to -69. It also empowers the boards to levy special assessments on properties benefited by drainage projects, provided that the assessments are apportioned to the benefits accruing to the particular parcel. I.C. §§ 36-9-27-39, -50, -62, -84(a), -112. The county surveyor assists the drainage board in the exercise of its statutory authority by providing specialized technical expertise. I.C. §§ 36-9-27-29, -34.

*Crowel v. Marshall Cty. Drainage Bd.*, 971 N.E.2d 638, 639-40 (Ind. 2012).

### Issue One: Transfer of Funds

[11] Landowners first contend that the trial court erred when it found that nothing in the Drainage Law prohibited the Board from intentionally creating a surplus in the maintenance fund in order to transfer up to seventy-five percent of that surplus to a reconstruction fund. Landowners acknowledge that the Board had statutory authority both to "create an excess of maintenance funds up to four (4) times the annual assessment and capped at eight (8) times" the assessment and to transfer up to seventy-five percent of the excess maintenance funds to the reconstruction fund. Appellants' Br. at 15 (citing I.C. §§ 36-9-27-43 and 36-9-27-45.5). But Landowners maintain that the Board was not authorized to "commit[] future uncertain excess maintenance funds" to repay a loan for the anticipated reconstruction project. *Id.* at 13.

Indiana Code Section 36-9-27-45.5 (2019) provides as follows:

> (a) This section applies when a county surveyor advises the drainage board that in the county surveyor's opinion a maintenance fund has a balance in excess of the amount reasonably needed in that fund for maintenance work in the foreseeable future.

> (b) The board may transfer an amount up to a maximum of seventy-five percent (75%) of the money in the maintenance fund to a reconstruction fund that covers the same watershed as the maintenance fund from which the money is transferred.

Landowners assert that the trial court misinterpreted the statute when it found that the Board was authorized "to obligate future anticipated excess maintenance funds to fund a current reconstruction project." Appellants' Br. at 15. In particular, Landowners contend that

> [t]he key word which the Trial Court failed to give meaning to and which its conclusion of law rendered meaningless is "has." Has is a word of present tense. It means that the maintenance fund must currently have the funds in order for the Board to transfer them. In this case, the Board's decision, which was upheld by the Court, commits unknown future funds to make payments on a $4.6 million-dollar reconstruction project which the maintenance fund may or may not have in the future.

Appellants' Br. at 17.

Landowners' contentions on this issue miss the mark. It is well settled that, if a statute is unambiguous, we may not interpret it but must give the statute its clear and plain meaning. *Wallen v. Hossler*, 130 N.E.3d 138, 146 (Ind. Ct. App.

2019). The parties do not dispute that the statute is unambiguous, and we agree. The clear and plain meaning of the statute permits a drainage board to transfer up to seventy-five percent of the money in a maintenance fund to a reconstruction fund. Landowners are correct, of course, that "the maintenance fund must currently have the funds in order for the Board to transfer them." Appellants' Br. at 17. But that is not the issue here—the Board did not transfer nonexistent funds.

[15] The crux of Landowners' contention on appeal is that the statute cannot be read to authorize the Board to count on future excess funds in the maintenance fund to repay a loan on the reconstruction project. As the trial court noted, Landowners assert that a transfer of excess funds is only authorized if excess funds are "created by the routine collection of assessments." Appellants' App. Vol. 2 at 30. But the statute is silent whether a Board, as here, may intentionally create a surplus in a maintenance fund for the express purpose of paying for a future reconstruction project. It is well settled that we may not add new words to a statute which are not the expressed intent of the legislature. *City of Lawrence Utils. Serv. Bd. v. Curry*, 68 N.E.3d 581, 585 (Ind. 2017). Accordingly, we cannot read a prohibition into the statute where there is not one. Further, we note that, under the Home Rule Act, a governmental unit's authority includes "not only all powers granted to it by statute, but also 'all other powers necessary or desirable in the conduct of its affairs, *even though not granted by statute*.'" *City of North Vernon v. Jennings Northwest Reg. Utils.*, 829 N.E.2d 1, 4 (Ind. 2005) (quoting I.C. § 36-1-3-4(b)(2); emphasis added).

[16]    In sum, as the trial court correctly found, nothing in the statute prohibits the Board from intentionally creating a surplus in a maintenance fund for the express purpose of ultimately transferring up to seventy-five percent of the money in the fund to a reconstruction fund. And, because the Board can only transfer the funds when the maintenance fund "has" excess funds, the Board's funding plan does not violate Indiana Code Section 36-9-27-45.5. Finally, nothing in the Drainage Law prohibits the Board from financing the reconstruction project and using excess maintenance funds to repay the loan. We hold that the trial court did not err when it found that the Board's plan to pay for the reconstruction project does not violate the Drainage Law.

### Issue Two: Bonds

[17]    Landowners next contend that the trial court erred when it found that the Board was authorized by statute to fund the reconstruction project "through future potential maintenance excess funds" instead of through the sale of bonds. Appellants' Br. at 20. In support of their contention, Landowners assert that the trial court misinterpreted Indiana Code Section 36-9-27-94(a), which provides:

> (a) Whenever the board determines by resolution spread upon its minutes that the cost of constructing or reconstructing a particular drain is in excess of that amount that the owners of land to be assessed may conveniently pay in installments over a five (5) year period, it shall authorize the sale of bonds to finance the construction or reconstruction.

Landowners maintain that "Section 94(a) is not permissive but is mandatory when it states that the Board 'shall' authorize the sale of bonds to finance the reconstruction. The Trial Court's affirmation of the Board's plan to fund the reconstruction from the hoped[-]for future excess funds renders Section 94(a) meaningless." Appellants' Br. at 20.

[18] However, Landowners ignore the clear language of the statute that makes the mandatory sale of bonds contingent on a determination by the Board that the reconstruction cost "is in excess of that amount that the owners of land to be assessed may conveniently pay in installments over a five (5) year period." I.C. § 36-9-27-94(a). Here, there is no dispute that the Board did not make any such determination. Rather than pay for the reconstruction project with assessments, the Board adopted the Tipton County surveyor's recommendation to levy "[n]o additional assessments" and to fund the project through a loan to be repaid using the excess funds in the maintenance fund. Appellants' App. Vol. 2 at 167. Because there was no assessment[1] to be paid "in installments" by Landowners, the Board was not required to determine what they could "conveniently pay," and it was not required to sell bonds. I.C. § 36-9-27-94(a).

---

[1] We note that Landowners do not contend that the maintenance fund assessments, which were established in 2014, are required by the statute to be considered by the Board in determining what Landowners could "conveniently pay" towards a reconstruction project. I.C. § 36-9-27-94(a).

## Issue Three: Formation of Board

[19] Finally, Landowners contend that the trial court erred when it rejected their claim that the Board was not properly formed and should be disbanded. The trial court made two separate findings on this issue. First, the trial court found that Landowners' claim was time-barred because they did not timely file their petition for judicial review within twenty days of October 23, 1991, when the Board published the order establishing the Board. Second, the trial court found that Landowners' claim, brought twenty-seven years after the Board was formed, was also barred by the doctrine of laches.

[20] In their brief on appeal, Landowners' argument focuses on the alleged procedural deficiencies surrounding the Board's formation. But Landowners do not make cogent argument on the trial court's finding that their claim on this issue is barred by the doctrine of laches. "'Independently of any statute of limitation, courts of equity uniformly decline to assist a person who has slept upon his rights and shows no excuse for his laches in asserting them.'" *See SMDfund, Inc. v. Fort Wayne-Allen Cty. Airport Auth.*, 831 N.E.2d 725, 729 (Ind. 2005) (quoting *Penn Mutual Life Ins. Co. v. Austin*, 168 U.S. 685, 698, (1898)).

[21] In their brief on appeal, Landowners correctly set out the elements of laches, namely: "(1) [an] inexcusable delay in asserting a known right; (2) an implied waiver arising from knowing acquiescence in existing conditions; and (3) a change in circumstances causing prejudice to the adverse party." *See id.* But Landowners then assert, without any citation to the record, that "[n]one of the

required elements for the imposition of laches exists in this case." Appellants' Br. at 21.

[22] Landowners have not satisfied their burden on appeal to persuade us that the trial court erred when it found that their claim on this issue is barred by laches. Landowners baldly assert that "they had *no knowledge* of the defective Board formation until 2017." *Id.* However, Landowners do not suggest that they could not have discovered the alleged procedural deficiencies prior to 2017. Indeed, Landowners acknowledge that the alleged deficiencies were discovered once they "scrutin[ized] . . . stored records." *Id.* at 20. And Landowners' sole argument to the trial court on the issue of laches was that, prior to 2017, "there was no reason for anyone to" suspect a problem with the Board's formation. Tr. at 7. Without any allegation, let alone evidence, that the records relevant to the Board's formation were not available to them until 2017, we cannot say that the trial court erred when it found that Landowners' claim is barred by laches. *See, e.g.*, *SMDfund, Inc.*, 831 N.E.2d at 731 (holding plaintiffs' claim that airport authority was improperly constituted brought seventeen years after its formation was barred by doctrine of laches).

## *Conclusion*

[23] Landowners apprehend that the Board's scheme for financing the reconstruction project and repaying the loan using up to seventy-five percent of the maintenance fund annually risks a future lack of funds for maintenance projects. But Landowners ignore the legislature's clear intent to grant the Board authority to transfer up to seventy-five percent of the maintenance fund to a

reconstruction fund. As the Board points out, such a transfer can only be made if a surveyor advises the Board that the maintenance fund "has a balance in excess of the amount reasonably needed in that fund for maintenance work in the foreseeable future." I.C. § 36-9-27-45.5(a). Thus, Landowners' fear of a maintenance fund shortfall is unwarranted.

The trial court did not err when it found that nothing in the Drainage Law prohibits the Board from funding the reconstruction project through a loan to be repaid out of a reconstruction fund made up of excess funds transferred from the maintenance fund. The trial court did not err when it found that the Board was not required to sell bonds to finance the reconstruction project. Finally, the trial court did not err when it found that Landowners' contention that the Board should be disbanded is barred by the doctrine of laches.

Affirmed.

Bailey, J., and May, J., concur.