**J.F. SCHRADER, Appellant–Petitioner,**

v.

**PORTER COUNTY DRAINAGE BOARD, Appellee–Defendant.**

No. 64A03–0707–CV–327.

Court of Appeals of Indiana.

Feb. 6, 2008.

Martin R. Lucas, North Judson, IN, Attorney for Appellant.

Herbert K. Douglas, Douglas, Koeppen & Hurley, Valparaiso, IN, Attorney for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Petitioner, J.F. Schrader (Schrader), appeals the trial court's Order denying his Petition for Judicial Review in favor of Appellee–Respondent, the Porter County Drainage Board (the Drainage Board).

We affirm.

### ISSUES

Schrader raises three issues on appeal which we restate as follows:

(1) Whether the trial court erred by ruling it was permissible for the Drainage Board to omit documents about E-coli contamination problems in the Swanson–Lamporte Ditch from the record after the documents were presented to the Board during its public hearing;

(2) Whether the trial court erred by permitting the Drainage Board to exclude portions of the watershed from the maintenance assessment area; and

(3) Whether the trial court erred by approving the flat rate maintenance assessment of the Swanson–Lamporte Ditch, as established by the Board.

### FACTS AND PROCEDURAL HISTORY

The Swanson–Lamporte Ditch, a tributary of Damon Run, is a regulated drain (the Drain) in Porter County, Indiana. It is 8.4 miles long and is composed of both open ditch and underground tile. Whereas the Drain is regulated, most of Damon Run is unregulated. Although the Drain services an area over 4.5 square miles wide, totaling over 2,800 acres of land, its natural watershed is much larger.

The Drain is at least one hundred years old, yet it has never been subject to maintenance by the Drainage Board. On September 8, 2005, the surveyor filed a report with the Drainage Board, classifying the Drain as a waterway in need of periodic maintenance, and submitted a proposed maintenance report. In his report, the

surveyor estimated the cost of maintaining the Drain at $23,981.86 per year, listed the property owners to be assessed, and proposed four options for setting the assessment rate. All suggested options were based on a yearly uniform, flat rate per acre, coupled with a minimum assessment for smaller tracts. After receipt of the surveyor's report, the Drainage Board published a notice and scheduled a public hearing for October 12, 2005.

On September 29, 2005, prior to the Drainage Board's hearing, Schrader filed a letter of remonstrance, specifically raising the following objections:

Please be advised this is a Remonstrance against the assessment of $94.40 imposed for the maintenance of [the Drain]. Levied against the property of Martha Stout Schrader in SE½ NE NE 14–3–6, Dup. No. 06 000 127 500.

(1) The true area of land in the Swanson–Lamporte Watershed is not being displayed and must be corrected.

(2) The fee is neither fair nor equitable.

(3) The fee is far in excess of benefits.

(4) The schedule and area of maintenance is not shown.

(Appellant's App. p. 68).

At the public hearing on October 12, 2005, Schrader argued that not all of the property owners living in the watershed were being assessed. The Drainage Board conceded the argument; however, it took the position that no assessment should be imposed on real estate located on those portions of the watershed that are unregulated. Schrader, joined by others, also raised objections about the potential for adverse public health impacts due to water pollution issues on the watershed and submitted documents showing high E. coli counts. In response, the Drainage Board indicated that almost all drains contain E. coli as farmers use manure on their fields.

The surveyor further replied that the Drainage Board has no authority to deal with the purported contamination, rather, it would be the responsibility of the environmental protection agency, the department of health, or the parties causing the pollution. The Drainage Board adjourned the October meeting to be reconvened on January 10, 2006.

At the January meeting, the Drainage Board adopted the surveyor's findings of fact and maintenance report, which established, in pertinent part:

4. Surface drainage will be improved by the project.

5. The maintenance project will improve agricultural and residential land.

6. The maintenance project will provide a proper discharge outlet for the regulated drain.

7. The project will benefit the health, safety and welfare for portions of Liberty Township.

8. The costs and expenses of said proposed maintenance would be less than benefits accrued to the owners of land benefiting by said maintenance.

9. There is no evidence that the project has a detrimental [e]ffect on land to be assessed.

10. All lands assessed for proposed maintenance lie within and drain into the watershed.

11. The total watershed will be provided with better drainage from this proposal.

12. All of the parcels contribute to the storm water run-off in the watershed.

13. Damage from flooding will be reduced because of this project.

14. Improved use of farmland will result due to this project.

15. Increased flooding in the watershed is due in part to the increase in

impervious land resulting from residential construction.

16. Increased flooding in the watershed is also due in part to the lack of maintenance of the Drain.

17. Public health and welfare will be improved by the proposed projects.

(Appellant's App. p. 43). Additionally, the Drainage Board adopted a modified schedule of assessments set at $4 per acre subject to a minimum assessment of $20 for tracts of five acres or less. Notice of the assessment was subsequently published in the Valparaiso Times on January 13, 2006.

On January 31, 2006, Schrader filed his Petition for Judicial Review. Three days later, on February 3, 2006, the Drainage Board filed its Answer denying all of Schrader's claims. Thereafter, on April 4, 2006, the Drainage Board filed its documentary record of the hearing, along with its summary of the oral statements at the public hearings. Schrader moved for inclusion of additional documents and a certified, verbatim transcript. On August 9, 2006, the Drainage Board filed documents and a certified transcript. On February 16, 2007, the trial court held a hearing on Schrader's petition. Consequently, on June 15, 2007, the trial court entered its detailed, twenty-page Order, denying Schrader's Petition for Judicial Review.

Schrader now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION
### I. Standard of Review

Indiana Code section 36-9-27-107 governs judicial review of a drainage board decision. Subsection (c) of the statute provides that "[i]n affirming or setting aside a decision or determination of the board, the court shall enter its findings and order or judgment on the record." In addition, Indiana Trial Rule 52(A)(3) states in relevant part that the trial court shall made special findings of fact without request "in any … case provided by these rules or by statute." Accordingly, the trial court in this case was required and did enter special findings of fact. *Id.*

We apply a two-tiered standard of review to special findings entered under T.R. 52(A). *See Clouse v. Noble Co. Drainage Bd.*, 809 N.E.2d 849, 857 (Ind. Ct.App.2004), *trans. denied.* First, we determine whether the evidence supports the findings and second, whether the findings support the judgment. *Id.* We will set aside the trial court's findings and conclusions only if they are clearly erroneous. *Id.* In reviewing the trial court's entry of special findings, we neither reweigh the evidence nor reassess the credibility of the witnesses. *Id.* Rather, we must accept the ultimate facts as stated by the trial court if there is evidence to sustain them. *Id.* Findings are clearly erroneous where a review of the record leaves us firmly convinced that a mistake has been made. *Id.* While we defer to the trial court's findings of fact, we do not defer to its conclusions of law. *Atterholt v. Robinson*, 872 N.E.2d 633, 639 (Ind.Ct.App.2007).

### II. Omission of Documents

First, Schrader asserts that the trial court erred by ruling that the Drainage Board properly excluded from its record documents showing the Drain to be contaminated with E-coli. A closer review of Schrader's allegation reveals a two-fold contention. Initially he disputes the Drainage Board's incomplete record and secondly, he claims that the Board's findings of fact # 7 and # 17 were arbitrary, capricious, and contrary to the evidence. Specifically, as both findings determined that the public health and welfare would be improved by the proposed project, Schrader maintains that these findings are

contrary to the evidence of E-coli contamination in the Drain, presented to the Drainage Board during the public hearing.

The record discloses that during the public hearing of October 12, 2005, Schrader informed the Drainage Board that the Drain was polluted. Referencing a letter from the Environmental Protection Agency and the Indiana Department of Environmental Management, Schrader elaborated that water testing indicated a high level of pollution in the tile lines in Porter County. Later during the same hearing, another citizen, Mr. Hewitt, testified in a similar vein, stating:

If you look at what I submitted. I have two papers I submitted. One was the watershed built in the Burns Harbor Estate trailer court. That was approximately 15 years ago. It shows basically that raw sewage was going into the creek. It shows the fecal E. coli count of 1,800,000, which at the time is the highest they'd ever seen.

Another report that I have is from the Indiana Department of Environmental Management right here and it says right on the report, a raw sewage bypass exists. There has been raw sewage dumped in that creek and that the—let's see what arm, that would be. It would be arm one. As you probably know, water barely flows in arm one. Any sediments that would get into that ditch is going to settle to the bottom, in the silt. So when you dig that ditch, I'm not sure what you're going to find. You may find much of that raw sewage still in the ditch. You may find that the spoils (sic) are going to be creating central waste and such.

(Appellant's App. p. 58–59). None of the materials mentioned by Schrader or Mr. Hewitt are part of the record.

In *State v. Porter Co. Drainage Bd.*, 258 Ind. 662, 284 N.E.2d 78 (1972), our supreme court was faced with a similar issue. In *Porter Co. Drainage Bd*, the board failed to provide a full transcript of the hearing to the court *Id.* at 80. Instead, the board merely submitted a copy of the minutes from its meeting, which failed to include the petition, the reports on which the board relied, and the written findings of fact required to be made by the board. *Id.* In continuation of its established case law, the supreme court concluded that

Judicial review of the [b]oard's determination is a matter of right, and when a petition for review is filed in the proper court the [Drainage statute] requires that the [b]oard furnish to that court a complete record of the proceeding before the [b]oard *as well as all pertinent documents pertaining thereto* so that the court can discharge its function of properly reviewing the determination by the [b]oard.

*Id.* (emphasis added). Accordingly, it is the Drainage Board's duty to provide us with a complete copy and all pertinent documents.

Nonetheless, here, we find that the record is complete. The Drainage Board is empowered by the Indiana Drainage Code, as encapsulated in I.C. § 36–9–27 *et seq.*, to establish legal drains in their county and to allocate the necessary assessments against the affected landowners. *See, e.g.*, I.C. §§ 36–9–27–15 and 36–9–27–39. The statute carefully delineates the power of a county's drainage board to insure fairness to the landowners involved by proscribing specific and detailed procedures that must be followed in each case. *See Porter Co. Drainage Bd.*, 284 N.E.2d at 79. The sole mention of pollution in the Drainage Code is the requirement in I.C. §§ 36–9–27–23(a)(2) and 36–9–27–17(c) that when considering to connect a private drain to a regulated drain, the Drainage Board must

investigate the pollution it might receive from the connection.

The case at hand is not a request to connect drains, but rather involves the creation of a maintenance fund in order to clean and remove obstacles from the Drain. As indicated by the Drainage Board during its public hearing of October 12, 2005, a clean-up of a purported E-coli contamination in the Drain would not be the responsibility of the Board and any assessments collected by the Drainage Board could not be used to address that possible problem. Therefore, we conclude that any paperwork with regard to an E-coli contamination, referenced by Schrader and Mr. Hewitt, did not have to be included in the record as it is not pertinent to the establishment of a maintenance fund. *See Porter Co. Drainage Bd.*, 284 N.E.2d at 80.

■ We now turn to Schrader's contention that the trial court erroneously decided that evidence supported the Drainage Board's findings # 7 and # 17. Both findings determined that the proposed project is beneficial for public health and safety. Our review of the record discloses that during the Drainage Board's initial hearing in October 2005, the Board indicated that

> [w]ith the improved drainage throughout, where we're not just having little blockages along the way, but we're purging water up high in one place and down the other, these are conditions where we usually have a flash flood that goes over the banks and goes rampant through and strips all vegetation and ground work around the area. So we can actually improve the overall hydrology, get more control over the stream flow.

(Appellee's App. p. 6). Similarly, during the subsequent hearing of January 10, 2006, the Drainage Board presented evidence establishing that they were "dealing with the flow of water and trying to manage and maintain so we're not seeing these high flow levels that bury roads. We're trying to slow down water by getting the water out of the system." (Appellee's App. p. 24). In light of the foregoing, we find that the Drainage Board's findings are supported by substantial evidence that the envisioned project will be beneficial for the public health and safety. *See Clouse*, 809 N.E.2d at 857. As a result, we refuse to disturb the trial court's ruling.

### III. *Assessed Watershed Area*

■ Next, Schrader argues that the trial court erred in approving the Drainage Board's area of land to be assessed to pay for the maintenance work to the Drain. In particular, Schrader claims that the Drainage Board assessed less than the entire watershed. As a result, he maintains that the assessed land is paying for work benefiting properties in the unregulated area of Upper Damon Run. Thus, he claims that while the Drainage Board intended to benefit the entire watershed area of the Drain, only a certain, smaller portion of it is assessed to carry the total maintenance cost. We disagree.

The record supports that the Drain's natural watershed is comprised of the regulated Drain and several unregulated portions of Damon Run. Pursuant to the Drainage Code, "each regulated drain in a county is under the jurisdiction of the board." I.C. § 36–9–27–15. Accordingly, based on the clear statutory language, the Drainage Board can only impose its authority over the Drain and not the unregulated portions in its watershed area. When a regulated drain becomes in need of periodic maintenance, the surveyor must prepare a maintenance report which includes:

> (1) The estimated annual cost of periodically maintaining the drain.

(2) The name and address of each owner of land that will be affected by the proposed maintenance, and the legal description of the land of each owner, ...

(3) the nature of the maintenance work required and how frequently the work should be performed.

I.C. § 36–9–27–38. After the board receives a maintenance report pursuant to the statute, it shall prepare a schedule of assessments, including a description of the land benefited, the percentage of estimated cost of periodically maintaining the drain based upon the benefit accrued to the land, and the amount annually assessed against each tract of land for maintenance. *See* I.C. § 36–9–27–39. To perform the maintenance work on the *regulated* drain, the county surveyor and the board are granted a right of entry over and upon the land lying within 75 feet of any *regulated* drain. *See* I.C. § 36–9–27–33 (emphasis added).

In his September 8, 2005 report the surveyor proposed an assessment area that received the benefits from the scheduled annual maintenance. During the October 12, 2005 hearing, the Drainage Board acknowledged that some waterways near the Drain, specifically Damon Run and Salt Creek, are not regulated. After this hearing, the surveyor toured the area three more times and removed 22 parcels and 116 acres from the original assessment area.

Based on this evidence and the statute, the trial court found that "[a]ssessing unregulated parts of the [D]rain ... would be pointless because the Board does not have the right to enter upon the land and improve the [D]rain." (Appellant's App. p. 20). Accordingly, the trial court affirmed the Drainage Board's assessment area. We agree. Although it would be difficult to dispute that maintenance work in the regulated Drain benefits the land located further up the watershed, in its unregulated portion, it is clear that the Drainage Board can only exert assessments on the land within the regulated portion of the watershed. In light of these considerations, we cannot say that the trial court's determination is clearly erroneous. *See Clouse,* 809 N.E.2d at 857.

### IV. *Uniform Maintenance Rate*

■ Lastly, Schrader argues that the trial court erred by approving the Drainage Board's flat rate maintenance assessment. He claims that the Drainage Board's assessment is arbitrary, capricious, and contrary to case law. Here, the Drainage Board imposed an annual maintenance amount of $4 per acre, with a minimum assessment of $20 per year for tracts smaller than five acres. In support of his argument, Schrader directs us to *Hubenthal v. Crain,* 239 Ind. 646, 159 N.E.2d 850 (1959) and *Whitley, Noble and Allen Jnt. Drainage Bd. v. Tschantz,* 461 N.E.2d 1146 (Ind.Ct.App.1984). We find these cases to be distinguishable.

In *Hubenthal,* the appellants successfully attacked the method by which the county had assessed the land in a watershed for the purpose of repairing an open ditch. *Id.* at 851–52. The county ordered certain per acre assessments, which the trial court reduced after a hearing. *Id.* The supreme court explained that:

In this case the assessment per acre was arrived at initially by the surveyor and viewers and finally by the court by first estimating the cost of an arbitrary segment of ditch which laid within a watershed area and then dividing the number of acres in the watershed area into said estimated cost. *The extent to which the particular land would or would not be benefited as compared with other land in the area was not considered in establishing the particular assessment.*

*Id.* at 852 (emphasis added). The court emphasized that "the clear mandate" of

the statute in effect at that time was that "the costs of installation or repair of drains shall be apportioned according to the benefits derived therefrom." *Id.* at 853 (quotations and citation omitted). Because the *Hubenthal* assessment did not take into account benefits to the tracts of land, the court reversed the trial court's judgment and remanded for a new trial. *Id.*

More recently in *Whitley*, 461 N.E.2d at 1147, the drainage board approved a project to clear the Eel River and ordered a uniform assessment upon all tracts of land within the Eel River watershed. But as in *Hubenthal*, the drainage board in *Whitley* did not assess the benefits to each tract of land. Instead, the theory behind the uniform assessment was that every acre of land which drained into the river contributed to the drainage problems and, thus, all tracts must pay equally. *Id.* at 1147–48. When landowners challenged the assessment in their petition for judicial review, the trial court concluded that the assessment was arbitrary, and we affirmed the trial court's conclusion on appeal. The *Whitley* court followed *Hubenthal*, explaining that "the current drainage statutes retain the prior law's requirement that assessments be based upon benefits accruing from the maintenance." *Id.* at 1148.

In *Clouse*, 809 N.E.2d at 864, we clarified that *Hubenthal* and *Whitley* propone the requirement, currently included in I.C. § 36–9–27–39(2), that the percentage of the cost of the periodic maintenance assessment to each tract of land shall be based upon the benefit accruing to each tract from the maintenance. Distinguishing the two precedents, the *Clouse* court emphasized that the Noble County drainage board had not imposed a per acre assessment rate without first considering the benefits and damages to the affected tracts of land. *Id.* Determining that the surveyor recommended the per acre and minimum per parcel rates after he had

viewed the tracts of land and considered the various benefit factors set out in I.C. § 36–9–27–112(a), the court upheld the flat rate assessment. *Id.* We concluded that "[i]n a watershed system, drainage within the watershed does not respect boundary lines, and a pro-ration of benefits and assessments based on acreage is not unreasonable, provided that the benefits have been considered." *Id.*

Likewise here, the record clearly supports that prior to establishing the flat rate, the surveyor toured the area, used topographical maps, and studied aerial photographs in considering the individual benefits. Additionally, the surveyor revisited the area after the October 12, 2005 meeting resulting in a reduction of the assessment area. This eventual amendment to the assessment area indicates the surveyor carefully considered all evidence in setting the uniform assessment rate. The record is devoid of any evidence that the Drainage Board's imposition of the flat rate assessment was arbitrary or capricious. Accordingly, we hold that the trial court did not err when it affirmed the Board's Order.

## CONCLUSION

Based on the foregoing, we conclude that (1) the trial court properly ruled that the Drainage Board did not have to admit documents about a purported E-coli contamination; (2) the Drainage Board was justified in excluding portions of the Drain's watershed from the assessment area; and (3) the Drainage Board's imposition of a uniform assessment rate was not arbitrary as a matter of law.

Affirmed.

KIRSCH, J., and MAY, J., concur.